Your last case this morning, United States of America v. Paul. Mr. Ackerman. Thank you. Before we begin, Mr. Ackerman, I must comment on your splendid uniform. We were insisting that I get my bar mitzvah suit and my vest, and so I'm doing the best I can. I've never seen you look better.  I remember I didn't notice in the beginning, because I didn't... Actually, I could see Mike, but I couldn't see you. That's the lead counsel. Well, he's always well-dressed. If the court please. I'm Alan Ackerman. I represent, along with Michael King, Steven Paul. My hearing is a little skewed this morning, perhaps from the snow. I don't know. So in the unlikely event any member of this distinguished panel has a question, I'll do my best to hear and answer. This case is about, do we trust the Department of Justice? The record reflects in our case, and as the court can tell, I didn't bring up all sorts of notebooks. I have a piece of paper. The record reflects that the Department of Justice alternately discussed both immunity and deferred prosecution with the lawyers for Steven Paul. In the government's brief, they said, ha-ha, Steven Paul never testified that we told him he had immunity. Well, of course not. They told his lawyers, particularly the only criminal lawyer representing him at that time, meaning 2009 to 2012 or 13, and that would have been William Cook, who is a former very fine AUSA in this building and a former opponent of mine. Is your position that they promised the lawyer his client would get immunity or that there were discussions about immunity with the lawyer? The court, please. At TR 105-6 of the 8-29-16 record, there is a lengthy convoluted question by Mr. King to Mr. Cook, which includes, and did she apologize because she wasn't giving you the promised immunity or words to that effect? To which Mr. Cook said, yes. That is the record on promises. There are express, there are equitable, there are informal, and there are implied. All these forms of immunity have been discussed by this court. And I hasten to add, it's quite by chance that Presiding Judge Kaney sits before me because some years ago, he wrote an opinion where he denied implied immunity to a woman in U.S. versus Quintanilla, and he commented to the effect, or he wrote very insightfully, I might add, that the record did not reflect that she was ever even promised immunity. Here we have, from at least October 16, 2009, expressions by the government to defense counsel, representations, promises, that isn't what we negotiated, that isn't what we've discussed, talking about deferred prosecution now. And then we have, about four or five days after 10-16-09, when the mysterious draft DPA surfaces, and I'll have a comment about that, we have a phone call between government counsel and Mr. Cook, and one of his accolades, I believe his name was Roberts, immunity is back on track. And never another word about deferred prosecution. Until our record reflects, May 2010, when the government brought up, is it possible to have some diversion program here? And Mr. Cook said, no. No. You're talking about corporate diversion, and the answer is no. Never exploring it further. What do we have? We have the Department of Justice in this building, who represents the government every day before this court, representing to defense counsel, yes, you have immunity, and by the way, if that doesn't fly, we have deferred prosecution. And then the question is, well, wait a second. The document, the deferred prosecution document, is a draft. After all, there's not all the facts in there. That is so remote, it may be laughable, because at that point, Mr. Paul had told the government everything about this case that there was to hear, including taping conversations, including explaining to the U.S. attorney, who sits in this courtroom in this case, who will talk to this court, where he explained the entire scheme to the government. The entire scheme. This is before and after he taped calls, he made visits, he explained everything to the FBI, he made personal visits. How do you get around the fact that your client, after he was sworn in by the district court judge at the change of plea hearing, specifically told the district court judge, when he was pleading guilty, that no other promises had been made to him by the government or anybody else? His understanding at that time was there were no promises that day or the week before. And remember, I'm sorry, Your Honor. So you're saying, you're taking the position that he understood at that point, not prior promises? The Court, please, I appreciate the question, and I understand fully the veracity that goes with the sworn testimony. But he also told the Court during the hearing, though, that he didn't think it applied to this. And besides that, if the Court please, guilty pleas even that are accorded Rule 11 compliance must be knowing and voluntary. And at that point, when he pled guilty, he had been told by Cook, if you believe Cook, don't take the DPA. And there was never a word about it after that. He was told, by the way, you have to make restitution in order to get the last obstacle of immunity. And he did that. And he got a release from Blue Cross. And then in spring of 2011, 2011, two years later now, the government contacts what, who was the lead civil lawyer who testified, Adam Kalasoff, and apparently said, by the way, we're indicting your client. And the government maintains, wait a second, there was another criminal lawyer. He didn't come on until just before the guilty plea. But for the motion to withdraw the plea, based on your allegation that your client received immunity, how do you get around the fact that he told the judge, while under oath, that no other promises had been made to him? The Court please, how does the government tell this Court that he didn't have immunity? Why didn't the government... That's a different question. I know better than to argue with the Court. I'm just trying to get an answer to the question of how do you get around that under oath, your client specifically said to the district court judge that he was pleading guilty, that he was satisfied with his lawyers, and no other promises had been made to him. It defies imagination, if the Court please, that he understood what was going on at that time because he had been through all of this, including get the restitution done and you've got immunity. Your client was a businessman operating a bunch of chiropractic clinics. He was educated. How would it defy logic? I answer that by saying this Court's precedent notices that, while in my brief I've cited the cases, suggesting that somebody can have a college education but be stupid when it comes to criminal litigation, and I think Judge Easterbrook said something like that in one of these cases where he said you don't have to... It's cited in my brief. Counsel, I'll give you two more minutes. May I have it for rebuttal? I'm sorry? May I have it for rebuttal if I may? Yes. Thank you. Thank you. Counsel, you've got 12 minutes. Thank you. You don't have to take it all. May it please the Court. Renee Rodney on behalf of the United States. Your Honors, the issue before you is whether the District Court abused its discretion when it denied the defendant's motion to withdraw his plea agreements on the grounds that he claimed he had received immunity from the government. The District Court correctly found that there was no actual offer of or agreement for immunity, and the District Court's finding was based in the information in the record, some of which was previously cited by Judge Sainee. There was the plea letter, which the defendant signed shortly before he was charged in the case, acknowledging that he would be charged and that he intended to plead guilty. There's the plea agreement in and of itself, which detailed the defendant's admissions to the health care fraud scheme and the anticipated sentencing guidelines. And, of course, there is the plea colloquy in which the defendant swore under oath that he understood the charges that were brought against him and the terms of his plea agreement, and significantly that no other promises had been made to him outside of that plea agreement. The defendant also acknowledged that he was aware of the penalties, of the restitution owed, and of the waiver of certain rights. The District Court even noted that the defendant was given an opportunity to ask questions during the change of plea hearing, and he felt to do so. So, based on that information and the affidavits submitted by the defendant in support of his motion, and affidavits from some of the defendant's prior counsel, the District Court found that, at most, the defense counsel was hoping that the line prosecutor would recommend immunity from prosecution and not that the defendant actually had immunity. And because the defendant had not received immunity, his counsel was not ineffective for not challenging the indictment before he pleaded guilty. Did you participate in any of the negotiations? I'm sorry, Your Honor? Did you participate in any of the negotiations? Yes. So you were there for all of this? Yes. And it's all true? Either his imagination is working wild or he's lying, right? I'm sorry, Your Honor? Either his imagination is working overtime or he's lying about what happened? Well, Your Honor, the District Court found that some of the defendant's testimony is not credible. I'm asking your opinion, not the District Court's opinion. You were participating in these things? Your Honor, I did offer the defendant a proffer letter, and I was there at the change of plea hearing. And there were discussions of immunity but no formal offer of immunity. The proffer was made and he rejected it? No, Your Honor, I was referring to a proffer letter, which the defendant signed at the outset of his cooperation with the government. I understand there was no signed letter. That's different from an immunity agreement, Your Honor. The letter just stated what the defendant told the government. But there was a signed immunity letter? There was no signed immunity letter, Your Honor. What letter was signed? I was initially referring to the proffer letter. No, no, I asked what letter was signed. There was no letter signed. Oh, the plea agreement was signed, Your Honor. Oh, all right. Yes. Did he sign the proffer letter, too? Defendant Paul did sign the proffer letter. Yes. And in that letter he acknowledged that the government was free to use any investigative leads developed from his proffer against him. And that's relevant because counsel is asking this court to rely on the notion of equitable or some type of informal immunity. But in those cases, those defendants actually had some type of agreement with the government that certain information wouldn't be used against him and against those defendants, and that is not the case here. So those cases are an opposite to the matter at hand. Just for my information, you used the term line prosecutor, I think? Yes. What does that mean? The line prosecutor is a non-supervisor or the designee or private instead of a corporal. Okay, I get it. It's a non-supervisory position, so the line prosecutor doesn't have the authority to make certain offers such as immunity without a plea. So in the opposite, there is a distinction. The line prosecutor can only do so much without authority. That's correct. Okay, great. Thank you. Do you agree that the deferred prosecution was offered at one point? No. Based on the district court's findings, the deferred prosecution agreement, which was a draft presented in October 2009, represented the initial basis of negotiations. But it was presented for negotiating. I'm not saying it was blessed by the supervisors, but it was. A draft, unsigned copy without any detail other than the defendant's name was presented. Was that presented the day he was supposed to testify in the grand jury? No. The October 16, 2009 meeting at the U.S. Attorney's Office was preparation for a future grand jury appearance. Your Honors, I'll conclude with just emphasizing that the district court's denial of the defendant's motion to withdraw his plea agreement on the grounds that he had received immunity, the denial of that motion was based in the record. The district court's findings were not clearly erroneous. And if there are no other questions from the court, the government respectfully requests that you affirm the judgment of the district court below. Thank you. Mr. Ackerman? Rene, did you need this? The deferred prosecution draft was handed to lead counsel with statements according to this record, I apologize, this is not what we've been talking about. And according to Cook, she apologized because this is not what was promised. Now, I have seen many gold badges, many. I've not seen any U.S. attorney authorization, identification which says, sorry, I'm a line attorney only, I really have no authority to bind the government. Well, wait a second. These are the people who come before you every day and make representations every day. I asked the court to vacate the order below, remand it with directions that they reoffer the DPA because that's consistent with U.S. Supreme Court precedent today. Thank you. In Santa Bella? Yes. Giglio. Giglio in Santa Bella. They'll tell you names, Judge, I get them confused sometimes. I'm sorry. Have a good day. Thank you. Thank you, Mr. Ackerman. Thanks to both counsel. The case is taken under advisement, and the court will be in recess.